**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **VICTORIA LOWERY LEECH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.** 3:21-cv-647-CWR-FKB |
| | ) | |
| **MISSISSIPPI COLLEGE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JURY TRIAL DEMANDED

## COMPLAINT

**COMES NOW,** Plaintiff Victoria Lowery Leech, and states as follows:

## PARTIES

1.　　Plaintiff Victoria Lowery Leech ("Professor Lowery") is a resident of Jackson, Hinds County, MS. Professor Lowery is a white woman.

2.　　Defendant Mississippi College ("MC") is a private educational institution and a Non-Profit Corporation, in good standing and incorporated under the laws of the State of Mississippi, with its principal place of business located at 200 South Capitol Street, Clinton, MS 39056. MC may be served with service of process on its registered agent, Blake Thompson, whose address for service of process is 200 South Capitol Street, Nelson Hall 110, Clinton, MS 39056.

## VENUE AND JURISDICTION

3.　　The Defendant is subject to the jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. 1391(b)(1-2).

## FACTUAL ALLEGATIONS

**A. Professor Lowery is recruited to join MC Law in order to overhaul the Advocacy Program.**

4.      In 2005, Professor Lowery was recruited to join the faculty of Mississippi College School of Law ("MC Law").

5.      Prior to Professor Lowery's arrival at MC Law, the Advocacy Program was underdeveloped and underfunded. Yet, advocacy programs are essential to any law school. While doctrinal classes teach students what the law is, advocacy, or skills-based classes, like depositions skills, trial practice, and negotiations, teach students *how* to practice law and prepare students for the real world.

6.      Accordingly, Professor Lowery was targeted by the school to build a new and improved Advocacy Program because of her excellence in legal writing and advocacy. Professor Lowery was hired with the expectation that she would eventually become the Director of MC Law's Advocacy Program (the "Program").

7.      By any account, Professor Lowery exceeded all expectations, transforming the less-than-desirable Advocacy Program into one of the best programs of its kind across the country.

8.      For example, upon Professor Lowery's arrival to the school, MC Law participated in only three (3) external appellate advocacy Moot Court Competitions and hosted only one (1) internal competition. By the time Professor Lowery was constructively terminated by MC Law, students participated in at least thirteen different (13) external competitions and at least three (3) internal competitions on campus. Additionally, whereas prior competitions were limited only to appellate advocacy, Professor Lowery worked to expand MC Law's participation in a broad range of advocacy skills competitions including pre-trial, trial, and alternative dispute resolution.

9.      But Professor Lowery's work with the Program did not end with just increasing its scope—Professor Lowery also drastically improved the quality of education provided by the Program. In fact, during Professor Lowery's tenure, MC Law's Moot Court Program repeatedly received a national ranking, an accomplishment that even much better-funded programs have not achieved.

10.     At one point, MC Law's Moot Court Program was ranked 4th among law schools across the nation, bringing national attention to the school. Likewise, Professor Lowery's student advocates frequently competed in (and won) invitation-only competitions reserved for the best Moot Court teams from law schools across the United States.

11.     Indeed, under Professor Lowery's careful eye, the acclaim and success of the Advocacy Program became the most important recruiting tool for the school, attracting many prospective MC Law students and resulting in millions of dollars in tuition payments and donations to the school.

12.     To that end, in a 2012-2013 Self-Study Assessment provided to the American Bar Association (the "ABA") (written by Professor Jeffrey Jackson, one of the school's most recognized and accomplished academics), the school touted, "MC Law is probably best known now for its advocacy program, **the success of which is due largely to Professor Lowery's leadership** and to an institutional commitment to financially support our students in competitions."

13.     Professor Lowery has repeatedly been recognized as one of the most accomplished and outstanding experts in legal writing and courtroom advocacy in Mississippi and nation-wide by numerous state and national experts in these fields.  She has also earned countless awards and accolades for her work at the state and national level.

14.     For example, Professor Lowery is a National Institute for Trial Advocacy Faculty Member, a prestigious appointment that only very few attorneys qualify for, let alone earn. Professor Lowery has also been recognized by Bryan A. Garner, the most preeminent legal writing scholar in the United States and former clerk to U.S. Supreme Court Justice Antonin Scalia. Bryan Garner is also Editor-in-Chief of Black's Law Dictionary. Mr. Garner also acknowledges and credits Professor Lowery for her contributions in his monograph on statutory interpretation and in his many discussions with current and former Supreme Court Justices on the topic of legal writing.

15.     As with her devotion to the success of the Moot Court Program, Professor Lowery also successfully utilized her knowledge and expertise in legal writing to craft a new and exceptionally successful upper-level legal writing curriculum at MC Law. The consistent high national ranking of the MC Law Advocacy Program is proof of this success.

16.     Equally as successful as the Moot Court Board and skills courses, Professor Lowery's work in developing, designing, and implementing an upper division legal writing curriculum as well as advanced writing skills courses fashioned a new standard for legal writing at MC Law and in Mississippi.

17.     To date, Professor Lowery continues to be asked to teach Continuing Legal Education courses and clinics on legal writing. Professor Lowery is also credited by many alumni with preparing them for practice through her legal writing courses. With 16 years' experience at the time of her constructive termination, Professor Lowery was the most experienced (and the most accomplished) legal writing professor at MC Law.

**B. Professor Lowery's earned contractual 405(c) status entitled her to benefits reasonably similar to the benefits of tenure.**

18.     As a result of her hard work and success with the Advocacy Program, in 2010, MC Law notified Professor Lowery that she had been awarded a five-year presumptively renewable

contract with the school that incorporated the terms of the ABA's coveted Standard 405(c) status. *See, e.g.*, 2019-2020 Letter of Contract, attached hereto as **Exhibit A**.

19.     While, law schools generally do not offer traditional tenure to non-doctrinal faculty, ABA standards require accredited law schools to offer the traditional "tenure-like" status protections of academic freedom and security of position to clinical faculty under Standard 405(c).

20.     For non-clinical skills-based and legal writing faculty like Professor Lowery, the ABA does not require the "tenure-like" job security of 405(c) status. Instead, law schools sometimes offer 405(c) status to legal writing and skills faculty in order to attract and retain the best candidates for a given position.

21.     Thus, 405(c) status, when offered, grants a "form of security of position **reasonably similar to tenure.**" ABA Standard 405(c). According to the ABA, in order to qualify as a status "reasonably similar to tenure," 405(c) contracts must include "a separate tenure track or a program of renewable long-term contracts." ABA Standard 405, Interpretation 405-6. Additionally, 405(c) status requires "at least a five-year contract that is presumptively renewable or other arrangement sufficient to ensure academic freedom." ABA Standard 405, Interpretation 405-6.

22.     Because 405(c) status contracts are required to be reasonably similar to contracts granting tenure, once 405(c) status is incorporated into an employment contract, the employment contract cannot be terminated except for good cause or for the termination or material modification of the entire program. *See* ABA Standard 405, Interpretation 405-6.

23.     Professor Lowery earned tenure-like status as a presumptively renewable employee easily when eligible and without any delay or objection by the faculty.  After that she received at least two renewals as a five-year presumptively renewable faculty member.  Professor contract was due for renewal in May 2021, subject only to termination for good cause or material

modification or termination of Professor Lowery's program.  MC Law has not shown any cause for Professor Lowery's termination. Moreover, the programming offered by the Advocacy Program was not terminated. Rather, the school continues to offer the courses and curriculum cultivated by Professor Lowery, and that programming remains essential to the law school to this date.

24.     In fact, as a presumptively renewable tenure-like contract, Professor Lowery was entitled to renewal of her contract indefinitely, as ABA standards contemplate "renewal" of 405(c) contracts as a mere formality.

25.     Accordingly, Professor Lowery reasonably anticipated that this automatically renewable 405(c) tenure-like status would continue until she retired from teaching, as her "presumptively renewable" contract was anticipated to provide tenure-like job security. Thus, Professor Lowery was entitled to expect and rely on at least four more five-year, presumptively renewable contracts pursuant to her contractual 405(c) status.

**C.  Gender Discrimination at MC Law**

26.     While most of the term of Professor Lowery's first 405(c) contract at MC Law was marked only by her success, in 2014, Professor Lowery began to experience discrimination that would ultimately result in her termination from MC Law, in violation of her 405(c) status and federal law.

27.     In 2014, Dean Wendy Scott was appointed to Dean of the law school.
Jonathan Will, a white male and previously a tenured professor at MC Law, was named Associate Dean.

28.     Since that time, Jonathan Will has used his position as Associate Dean to discriminate against female faculty and staff, including, but not limited to, engaging in discriminatory and retaliatory behavior against Professor Lowery.

29.     On a daily basis, while Associate Dean Will acted cordially towards male professors who participated in discussions regarding the direction of the law school, Professor Lowery and other female employees received harassment and discrimination instead.  While Associate Dean Will never publicly reprimanded or harassed any male professor, Professor Lowery faced constant public reprimand and was subject to open retaliatory conduct from Associate Dean Will any time she expressed an opinion contrary to a policy or decision of the administration during a faculty meeting.

30.     Often, while advocating for additional funds or resources to be allocated to the Advocacy Program as an essential element of her position as Director of the Advocacy Program, Associate Dean Will thwarted Professor Lowery's efforts by publicly maligning the Program in faculty meetings and other public settings, despite the program's achievement of national success and its role as one of the school's most important recruitment tools.

31.     Moreover, it was apparent that Professor Lowery unlike any other faculty was not "ensure[d] academic freedom" by the school or from Associate Dean Will, who was responsible for faculty development.

32.     Immediately after becoming Associate Dean, Professor Lowery, as the responsible instructor of the school's legal writing program, became a frequent target of Associate Dean Will's attacks, retaliation, and harassment. Indeed, despite Professor Lowery's success in each aspect of her job and faculty responsibilities, she received unfounded criticism and was subject to countless sanctions by Associate Dean Will.

33.     While attempting to prepare her coursework in accordance with her expertise and training, Associate Dean Will micromanaged each of Professor Lowery's decisions relating to her curriculum and, despite his own lack of expertise in her subject area. Associate Dean Will also routinely publicly attacked Professor Lowery's professional opinions regarding skills-based and legal writing courses, in stark contrast to the academic freedom granted to other male faculty members and publicly claimed by Associate Dean Will himself for his course work.

34.     To be sure, Associate Dean Will supported the academic instruction and pursuits of male colleagues, rarely, if ever, challenging their professional opinions as inadequate. By contrast, Associate Dean Will emphatically and powerfully refused to allow any criticism of his own work or of the course content and teaching approach taken by other male colleagues.

35.     For example, on one occasion, in accordance with her responsibility as Director of Advocacy to liaise with the Director of Legal Writing, and as the instructor of the school's Appellate Advocacy courses, Professor Lowery expressed disagreement with an academic decision of the male Legal Writing Director. Instead of allowing the two equal Directors to discuss and reach a consensus on the issue, Associate Dean Will intervened in the discussion, reprimanding Professor Lowery and refusing to allow her to question the male Director's academic decision. Associate Dean Will instead instructed Professor Lowery to stay away from the curriculum, despite her responsibility as Director of Advocacy to consult on legal writing education.

36.     Additionally, Associate Dean Will abused his supervisory role by removing Professor Lowery from leadership roles such as committee assignments and other positions, apparently due to his belief that women like Professor Lowery should not be outspoken and should not contradict male authority.

37.     On one such occasion, after Professor Lowery expressed academic concerns regarding the direction of the Legal Writing Program, Associate Dean Will publicly removed Professor Lowery from a committee assignment in an open meeting. By removing Professor Lowery in an open meeting, an occurrence that had never taken place, Associate Dean Will intentionally sought to belittle and humiliate Professor Lowery in front of her peers. Associate Dean Will did not remove similarly situated male professors from positions and committee assignments, and especially would not have done so in an open meeting.

38.     Upon reporting this treatment to Dean Patricia Bennett, Professor Lowery was reinstated to her committee assignment, but no action was taken by the school, including any action against Associate Dean Will.

39.     Worse, while ultimately unsuccessful in removing Professor Lowery from the committee chair position, Associate Dean Will was eventually successful in silencing Professor Lowery with regard to legal writing. Refusing to acknowledge any merit regarding Professor Lowery's academic suggestions on the subject because of her gender, Associate Dean Will eventually caused Professor Lowery to be removed from the legal writing program altogether, despite her status as the most qualified and longest-serving legal writing professor at the school.

40.     In the 2017-2018 school year, Associate Dean Will continued his discrimination against Professor Lowery, informing her that she would no longer instruct Appellate Advocacy courses, courses for which she had carefully cultivated curriculum for over 12 years. For fourteen consecutive years, Professor Lowery had been the lone faculty member responsible for all in class instruction of Appellate Advocacy courses.

41.    Following Associate Dean Will's discriminatory removal of Professor Lowery from the legal writing program, the school hired inexperienced, younger, and cheaper professors to teach Professor Lowery's legal writing classes.[1]

42.    Moreover, both before and after her constructive termination, Associate Dean Will also demeaned and demonstrated his distaste for Professor Lowery to most, if not all, of the school's faculty. Numerous faculty members have informed Professor Lowery that Associate Dean Will continues to make derogatory and unprofessional remarks about Professor Lowery in professional and public settings.

43.    For example, faculty members have reported hearing Associate Dean Will shouting and making derogatory comments about Professor Lowery inside his office. These insults were hurled so loudly that they rang out into the hallways and into the ears of faculty and students.

44.    Moreover, many of the female faculty members have fallen victim to Associate Dean Will's discrimination. On a regular basis, Associate Dean Will interrupts female faculty members, refusing to allow them to speak. Worse yet, when angered during faculty meetings, Associate Dean Will has been known to shriek at female faculty while beating his fists on tables.

45.    Additionally, while female faculty members were chided or scolded for taking earned vacation days or necessary sick or personal leave, male faculty were permitted to take even unearned leave during the semester without comment.  As one example, a favored male faculty member was allowed to extend time off after a school break in order to take a cruise with his family. Another male faculty member was permitted to take paid sick leave at the start of the semester without informing his students or the Associate Dean for Academic Affairs of his absence.

---

[1] Despite this modification in her responsibilities as Director of Advocacy, Professor Lowery's 405(c) status remained unchanged.

46.     Associate Dean Will also has a known propensity for retaliating against female professors by making a derogatory mark in an offending professor's file after a disagreement or other perceived slight against him.

47.     Finally, Associate Dean Will's inappropriate behavior towards female faculty has been reported to the school by one or more faculty members, but no action was taken to reprimand Associate Dean Will. Worse, upon information and belief, the school has received complaints from students of sexual harassment, retaliation, and other inappropriate behavior by Associate Dean Will, while the school's inaction, fear, and threats of retaliation have likely prevented many more from coming forward.

48.     On numerous occasions, Professor Lowery and others repeatedly reported to Dean Bennett, Dean Scott's 2016 successor, this disparate treatment and the hostile work environment created by Associate Dean Will. Dean Bennett discouraged Professor Lowery from filing any internal grievance and would not give any guidance on how to file such a complaint. Indeed, the administration did not even inform the faculty of the existence of a formal complaint procedure until Spring 2020, following multiple reports of discrimination to the ABA.

49.     Dean Bennett also did not offer to intervene on Professor Lowery's behalf to address Associate Dean Will's discriminatory and bullying behavior. Instead, Dean Bennett suggested to Professor Lowery, the victim of constant harassment and retaliation by Associate Dean Will, to seek out Associate Dean Will, the employee who harassed, bullied, and retaliated against her and confront him herself, asking him to cease his offensive and retaliatory behavior.

50.     Moreover, in an apparent attempt to prevent Professor Lowery from further reporting the conduct or potentially leaving her position at the school, and while acknowledging

Associate Dean Will's discriminatory and abusive behavior, Dean Bennett repeatedly assured Professor Lowery that Associate Dean Will would "not be the next dean of the law school."

51.     Associate Dean Will's inability to conduct law school business professionally with female employees and students is well-known to students, the faculty, to the University, and specifically, to Dean Bennett, but the school has done nothing to curb his actions.

**D. After an ABA Site Investigation, MC Law Administration terminated Professor Lowery for refusing to lie to ABA Investigators, to punish her for reporting discrimination, and in a thinly-veiled attempt to satisfy ABA diversity standards.**

52.     At the end of February 2020, MC Law was visited by the ABA for its planned seven-year assessment, which is required for continued ABA accreditation. The ABA's site evaluation was conducted from February 29-March 3, 2020.

53.     In advance of the 2020 site visit, MC Law prepared a Self-Study Report and provided it to the ABA. As a result of the information provided in that Report, investigators for the ABA questioned the faculty members with 405(c) status, including Professor Lowery, about their experience with 405(c) contracts at MC Law.

54.     During her interview with Site Investigators, the investigators expressed concerns that the school was not providing enough protections to faculty with 405(c) status. The ABA Inspectors also later expressed to Professor Lowery and other faculty members that some clinical faculty members, entitled to 405(c) status under ABA rules, were not receiving those benefits.

55.     In addition to identifying faculty governance and employment issues, some faculty members also informed ABA Inspectors of issues with discriminatory conduct by the administration.

56.     Later, the ABA site-visit staff met with Dean Bennett and Associate Dean Will to address concerns about the school, including its application of Standard 405(c) and the allegations of discrimination.

57.     Apparently, following these remarks from ABA investigators, Dean Bennett assumed that Professor Lowery had complained to the ABA about Associate Dean Will's discriminatory conduct—just like she had previously complained to Dean Bennett. On a phone call with Professor Lowery a short time later, Dean Bennett, still upset, expressed her frustration with Professor Lowery and other professors like her, who would dare to "air the school's dirty laundry" when asked direct questions by ABA inspectors.

58.     In May 2020, the ABA inspectors produced the findings of their inspection to MC Law. The ABA's primary concern regarding Standard 405(c) was that MC Law was not in compliance with the requirement that full-time clinical faculty members be afforded a form of security of position reasonably similar to tenure. That is, the ABA found that some MC Law faculty members who were entitled to 405(c) benefits had not received them.

59.     The ABA inspectors also relayed that MC Law had not provided them with concrete efforts taken by MC Law to demonstrate its commitment to having a diverse faculty with respect to gender, race, and ethnicity.

60.     Also in May 2020, Professor Lowery grew concerned when she did not receive her annual Letter of Contract from the school. Normally provided in May each year, the Letter of Contract advises faculty as to the renewal of their contracts for the next school year.

61.     When Professor Lowery and others had still not received Letters of Contract by the end of May, Professor Lowery inquired with Dean Bennett, as to why she had not received a Letter of Contract. Dean Bennett advised Professor Lowery not to worry.

62.     During that conversation and at multiple other points throughout the summer, Dean Bennett assured Professor Lowery that her annual Letter of Contract confirming the continuation of her five-year presumptively renewable contract would be issued soon.

**E. Dean Bennett's first covert faculty meeting regarding 405(c) faculty**

63.     After the completion of the school's ABA inspection, and despite representing to Professor Lowery that she would remain in her position, on June 4, 2020, the administration called a meeting of only tenure and tenure-track faculty to discuss 405(c) faculty.

64.     Professor Lowery and other 405(c) faculty were not informed of the meeting and were not invited to attend.

65.     Further, those tenured and tenure-track faculty that were invited to the meeting were not informed as to the purpose for the meeting. The faculty, instead, were required to keep the existence of the meeting a secret.

66.     Specifically, Dean Bennett's June 2, 2020 email providing notice of the meeting, a true and correct copy of which is attached hereto as **Exhibit B**, explicitly instructed "Please resist the urge to speculate and share information of the meeting agenda and materials with others." While Dean Bennett claimed that the purpose of the meeting was to review what appeared to be innocuous policy regarding procedural issues for extending and renewing 405(c) contracts, the true intended purpose was to terminate Professor Lowery as Director of the Advocacy Program.

67.     With the select faculty gathered, Dean Bennett opened her specially-called faculty meeting by attempting to explain, wrongfully and falsely, that the ABA site inspectors had expressed concerns about the 405(c) employment contracts that would require an end to such contracts or a limitation of their use.

68.     No such concerns were ever expressed by the ABA inspectors. In fact, the direct opposite was true—the ABA inspectors' concerns were that some clinical faculty were *not* being provided 405(c) status by the school, despite the ABA's requirements.

69.     Despite Dean Bennett's representations, in the school's response to the ABA's site investigator's report, provided to the ABA on June 19, 2020, the school addressed the ABA's 405(c) concerns, acknowledging that the school *had not provided enough* 405(c) protection.

70.     Accordingly, Dean Bennett's claims to the faculty that the ABA had raised concerns that the school *had provided too much* 405(c) protection were intentionally false and an intentional attempt to misrepresent the ABA's guidance.

71.     As a result of Dean Bennett's misrepresentations, faculty members either were expressly or impliedly led to believe, wrongfully, that ABA guidance required termination of some or all of the school's existing 405(c) contracts.

72.     As a further call to action, Dean Bennett also represented that unless some or all of the 405(c) faculty members were terminated, she would have to start terminating or reducing the salaries of the tenured and tenure-track professors present at the meeting.

73.     With the stage set for termination, Dean Bennett then provided a recommendation that the faculty terminate only two professors of MC Law's five 405(c) status faculty—both white, including Professor Lowery.

74.     Outraged and shocked at discovering Dean Bennett's intended purpose for the covert meeting, numerous tenure and tenure-track faculty members objected to the move, correctly pointing out that the ABA standards, as well as the school-adopted faculty governance procedures, were being violated in the process.

75.     Specifically, both ABA standards and MC Law faculty governance procedures require that notice be given to professors in the case of termination or material modification of an academic program. Additionally, the standards and procedures require an opportunity for the professor to provide documentation in support of his or her program or position.

76.     Ultimately, the objecting faulty members convinced the Dean to allow Professor Lowery a small window of time in which to submit a statement in support of the Advocacy Program and her position as Director.

77.     Late in the evening following the June 4 meeting, Dean Bennett emailed Professor Lowery and another white 405(c) status professor, requesting a statement in support of the Advocacy Program to be submitted by June 7, 2020—over the weekend and less than 72 hours later. A true and correct copy of Dean Bennett's June 4, 2020, correspondence to Professor Lowery is attached hereto as **Exhibit C**.

78.     Professor Lowery, without recourse otherwise, quickly prepared a memorandum in support of the Advocacy Program and her position as Director and submitted it before the looming deadline. A copy of Professor Lowery's response is attached hereto as **Exhibit D**.

**F.  Dean Bennett's second covert meeting regarding 405(c) faculty**

79.     On June 8, 2020, with less than 24 hours to review Professor Lowery's submission, the tenure and tenure-track faculty met again to decide Professor Lowery's fate.

80.     Again, Dean Bennett moved the faculty to make a determination as to whether the "Appellate Advocacy Program"[2] had been materially modified or terminated, representing that

---

[2] It appears that in its haste to terminate Professor Lowery, the MC Law Administration pushed the faculty to hastily eliminate a program that does not even exist. While meeting minutes from the June 8, 2020 meeting reflect that the tenure and tenure-track faculty voted on the status of the "Appellate Advocacy Program," importantly, MC Law does not have an "Appellate Advocacy Program." Rather, Professor Lowery is the Director of the Advocacy Program. While initially Professor Lowery's title was Director of Appellate Advocacy, as her responsibilities grew, her title was modified to Director of the Advocacy Program.

such a faculty determination would permit the school to terminate Professor Lowery's 405(c) contract.

81. At Dean Bennett's insistence, eight professors voted to confirm that the "Appellate Advocacy Program" had been materially modified or terminated; eight professors voted to oppose.

82. With a tie among the faculty members, Dean Bennett refused to cast the final vote, attempting to avoid responsibility for the action and acknowledging that ABA Standards require such decisions to be made by the faculty. Instead, Dean Bennett noted that she would refer the matter to MC's main campus for final determination, in violation of faculty governance procedures.

**G. The plan to terminate Professor Lowery's tenure-like 405(c) Contract**

83. The administration's faculty meetings were a pre-text. The administration had no intention of actually eliminating or modifying the Advocacy Program—only to eliminate Professor Lowery and her role in it.

84. By getting rid of Professor Lowery, Dean Bennett and Associate Dean Will could kill three birds with one stone: (a) increase faculty diversity by replacing Professor Lowery with an African-American hire; (b) punish Professor Lowery for not lying to ABA investigators in order to cover for MC Law's various violations; and (c) to punish Professor Lowery for reporting to Dean Bennett the hostile environment and sex discrimination by Associate Dean Will.

85. But executing the plan would not be easy, however. In the June 4 faculty meeting, for example, faculty directly questioned why the school would eliminate its Advocacy Program, as the curriculum is integral to students' legal education.

86. In response, Dean Bennett assured faculty members that MC Law would continue to have all of the component parts of the Advocacy Program—a moot court board, advocacy-

related programming, intraschool competitions, interschool competitions, criminal and civil litigation certificates, simulation courses, a litigation and alternative dispute law center, a speaker series, and various other components.

87.     Indeed, since her constructive termination, MC Law has retained all of Professor Lowery's former programming. MC Law has even produced advertisements and commercials touting the success of the Moot Court Board and MC Law's dedication to teaching advocacy to students.

88.     Thus, the faculty vote to modify or eliminate the Advocacy Program was just pretext for eliminating Professor Lowery's position for discriminatory and retaliatory reasons.

89.     Moreover, in an attempt to further conceal the plot, Professor Lowery was never informed by Dean Bennett of the faculty's 8-8 tie vote at the June 8 meeting.

**H.  Dean Bennett misleads the ABA into believing that MC Law was adding 405(c) status to faculty members, rather than firing white female faculty members.**

90.     Instead, Professor Lowery was required to work over the summer without written confirmation of her salary or confirmation that her presumptively renewable contract had, in fact, been renewed. By late July, when Professor Lowery still had not received her annual 405(c) Letter of Contract as previously agreed by the school and promised by Dean Bennett, Professor Lowery reached out to Dean Bennett again for answers.

91.     Again, despite months of waiting, Dean Bennett did not inform Professor Lowery of the result of the meeting. Instead, on August 4, 2020, Dean Bennett attempted to persuade Professor Lowery to forgo her position as a faculty member and accept a staff position at the school.

92.     A staff position, unlike her 405(c)-faculty status, would not allow Professor Lowery to continue teaching advocacy courses and, more importantly, would not entitle her to 405(c) benefits. Accordingly, Professor Lowery refused to be demoted without any cause.

93.     Despite numerous conversations with Professor Lowery regarding her anticipated contract throughout the summer, Dean Bennett never informed Professor Lowery of the result of the June 4, 2020 or June 8, 2020 tenure and tenure-track only faculty meetings or that her 405(c) status would no longer be honored.

94.     At the same time that Dean Bennett was misleading Professor Lowery, the administration was also misleading the ABA.

95.     By letter dated June 19, 2020, shortly after calling these faculty meetings to terminate two *white* 405(c) status faculty members who had spoken honestly with the ABA, Dean Bennett submitted her response to the site evaluation report.

96.     In her response, Dean Bennett failed to report to the ABA that, in an effort to increase diversity and to punish professors who did not lie to the ABA, it was her intention to terminate two *white* faculty members who had been provided 405(c) status.

97.     Instead, Dean Bennett's response addressed the ABA's *actual* concern regarding 405(c) status: that other MC Law employees were improperly categorized and were providing clinical instruction without being granted 405(c) status. Dean Bennett promised the ABA that the status and position of some or all of the other employees would be properly categorized and reclassified, ensuring that all clinical instructors would receive 405(c) status with five-year presumptively renewable contracts. Once properly classified, all clinical instructors would have the same privileges and benefits, according to Dean Bennett.

98.     But, since they would have clearly shown that her statements to the faculty were false and pretextual, Dean Bennett refused to provide a copy of correspondences between the Dean and the ABA to MC Law faculty, despite the obvious importance of the content of those communications.

**I.  Professor Lowery's 405(c) status is terminated in the face of ABA censure.**

99.     Then, less than a week before the start of the 2020-2021 academic school year, Professor Lowery finally received a Letter of Contract from the school. A true and correct copy of the 2020-2021 Letter of Contract is attached hereto as **Exhibit E**.

100.     Except, instead of her usual 405(c) contract, Professor Lowery received a one-year non-405(c) contract that noted "This will be the last contract as Director of Advocacy."

101.     The contract accompanied an enclosed cover letter that falsely stated that the Law School Advocacy Program had been terminated or materially modified *on the basis of the faculty recommendation*.

102.     The letter did not explain the basis of this false assertion. Further, it did not provide Professor Lowery with a suitable alternative position.

103.     Despite Professor Lowery's wildly successful service in the role of Advocacy Director, the letter simply stated, "It is my hope that this notice will provide you with ample opportunity to find new areas of service."

104.     Professor Lowery did not sign the Letter of Contract.

105.     A few days later, at its August 13-14, 2020, meeting, the Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association (the "Council") considered the status of MC Law.

106.     The ABA's Decision of the Council provided by the ABA on August 25, 2020, indicated, among other things,

a.   Regarding race and gender discrimination:

(i)     that the site team reported that during the site visit interviews with faculty, the team received multiple reports of discrimination, retaliation, and bullying based on race and gender, including reports of actions by members of the Law School administration towards faculty members;

(ii)    that MC Law was required to provide the ABA information demonstrating that the Law School fosters and maintains quality of opportunity for faculty without discrimination or segregation on the basis of race or gender, including the affirmative steps taken to investigate the multiple reports of discrimination based on race and gender made to the site team during the visit;

b.   Regarding faculty diversity:

(i)     that the record was silent with respect to any concrete efforts the Law School takes beyond relying on the AALS Faculty Recruitment process to demonstrate its commitment to having a diverse faculty;

(ii)    that MC Law was required to submit information demonstrating by concrete action the Law School's commitment to diversity and inclusion by having a faculty that is diverse with respect to gender, race, and ethnicity, to include actions taken by the Law School in addition to attending the AALS Faculty Recruitment Conference.

    c. Regarding 405(c) status:

        (i)    that Dean Bennett had acknowledged that at least one clinical instructor should have been classified as a clinical instructor and stated the Law School would clarify the status and position of the three employees identified by ABA inspectors to require 405(c) status and properly categorize the positions, ensuring that all clinical instructors receive five-year presumptively renewable contracts, and, once properly classified, all clinical instructors will have the same privileges and benefits;

**J. Professor Lowery discovers that her contract was terminated in large part to make way for MC Law to replace her with a minority clinical 405(c) faculty member.**

107.    On Thursday, September 16, 2020, another faculty meeting called by Dean Bennett took place.

108.    Again, in order to avoid allowing the faculty time to review materials prior to the meeting, just as the meeting began, Dean Bennett emailed all faculty members the following:

    a. a copy of a two-page letter from the ABA dated Aug 25, 2020;

    b.  the six-page Decision of the ABA Council; and,

    c.  a single page of document No. 59212, a document that appears to be part of a more detailed report from the ABA.

109.    In the single-page document, Dean Bennett highlighted a single paragraph that referred to "multiple reports of discrimination, retaliation, and bullying based on race and gender," including reports of actions by members of the law school administration towards faculty members.

110.     Yet, the late notice of the materials prevented faculty members from preparing for the meeting, just as faculty members had no time to consider matters in advance of the June 4 impromptu review of academic programs led by 405(c) faculty.

111.     Following the distribution of documents via email, Dean Bennett scolded the *faculty* for raising concerns regarding discrimination, rather than addressing the race and gender discrimination.

112.     Similar to occurrences with Professor Lowery and at an April faculty meeting, Dean Bennett contended that faculty who had reported discriminatory conduct were "jeopardizing [the law school's] accreditation."

113.     Despite multiple requests, Dean Bennett refused to provide the faculty with the full ABA report, which prevented faculty from confirming her representation at the June 4, 2020 faculty meeting. In particular, prior to September 2020, faculty could not verify Dean Bennett's suspicious and confusing prior (mis)representations that all academic programs led by directors with 405(c) status would need to be considered for elimination because the ABA had raised concerns about 405(c) contracts.

114.     The August 25, 2020 correspondence from the ABA, however, made clear that Dean Bennett and other members of administration misled faculty members during the June 4, 2020 faculty meeting. To be sure, the ABA's correspondence detailed that the ABA's concerns about 405(c) were not to limit the use of 405(c) contracts at MC Law, but rather, the ABA was requiring the school to expand the use of such contracts so that two staff members who are or were teaching in the law school's clinics would be reclassified as 405(c) faculty members.

115.     In fact, the ABA conclusion letter did not include a single reference to non-clinical 405(c) faculty, such as Professor Lowery, *whatsoever*.

116.    The documents provided by Dean Bennett did, however, illuminate another cause of Professor Lowery's termination.

117.    The documents revealed the school had fallen out of compliance with the ABA's requirements for diversity of faculty and had also admonished MC Law for its lack of faculty diversity, requiring the school to take meaningful steps to make diverse hires.

118.    Accordingly, in the final moments of the September 16, 2020 faculty meeting, Dean Bennett expressed the administration's plan to grant 405(c) status to one particular staff member who was then teaching in the school's youth court and adoption clinics. Unlike Professor Lowery, the staff member recommended by Dean Bennet for promotion to 405(c) status was African American.

119.    While the school was obligated to offer Professor Lowery an equivalent position pursuant to her 405(c) status following the alleged termination or modification of her program, Professor Lowery was not offered this position or any position as clinical faculty. Instead, Professor Lowery's position and her 405(c) status were eliminated.

120.    Effectively, because Professor Lowery is white and does not satisfy ABA diversity goals, by terminating Professor Lowery and promoting the African American clinical staff member to 405(c) status, the school was able to bring itself into compliance with the ABA's 405(c) concerns, and was able to make a diverse faculty hire, all without increasing the school's faculty budget.

121.    Further underscoring the school's intent to terminate 405(c) status of white faculty in order to offer the status to diverse candidates, Dean Bennett also expressed a desire to extend 405(c) protection to a second African American staff member who taught externship courses.

122.    In fact, in Spring 2020, the school offered 405(c) status to another non-white faculty member working as the legal writing instructor. Not only did this faculty member have less legal writing experience than Professor Lowery, but this faculty member also had less legal writing experience than any other member of the faculty.

123.    Accordingly, while the school's goal of creating diversity initiatives and efforts to expand 405(c) job protections was intended to create a positive outcome, the school's execution of this initiative resulted in the school seeking to extend 405(c) status to two African American staff members and the actual termination of two long-time white 405(c) faculty members, including Professor Lowery.

124.    This decision, based on race, and disguised by the pretextual "program modification," resulted in the school refusing to honor its contractual promises to Professor Lowery.

**K. Retaliation at MC Law**

125.    Following the September 16, 2020 faculty meeting, Professor Lowery filed a formal complaint with Dean Bennett regarding the information contained herein, pursuant to the school's internal grievance procedures.

126.    Over a year later, no substantive response has been provided by the school.

127.    Additionally, upon being contacted by Professor Lowery, the American Association of University Professors reached out to MC Law on Professor Lowery's behalf, requesting that Professor Lowery's 405(c) contract be reinstated. A true and correct copy of that correspondence is attached hereto as **Exhibit F**.

128.    Specifically, the AAUP noted that because MC Law's stated basis for the termination of Professor Lowery's position was not cause or financial exigency, but the

discontinuance or "modification" of the law school's advocacy program, the law school had violated AAUP-recommended standard Regulation 4d, "Discontinuance of Program or Department for Educational Reasons" and Mississippi College's policy 2.31 by:

    a.   failing to discontinue the program based on educational considerations;

    b.   failing to provide 30-days' notice of consideration for discontinuance to Professor Lowery;

    c.   failing to make every effort to place Professor Lowery in another suitable position and/or to pay severance salary equitably adjusted to Professor Lowery's length of past and potential service; and,

    d.   failing to allow Professor Lowery to contest termination of her program in an adjudicating hearing of record before an elected faculty body.

129.    Again, MC Law has not provided a substantive response to the AAUP.

130.    Moreover, while Professor Lowery's Letter of Contract with the school for the 2020-2021 year indicated that Professor would be employed by MC Law for the remainder of the school year, despite her best efforts at resolution and to obtain information related to her class schedule for the following semester, Professor Lowery's name no longer appeared on the 2021 Spring Semester schedule when it was circulated.

131.    Additionally, Professor Lowery attended a meeting with Dr. Debra Norris on November 3, 2020 in a good faith effort to resolve her claims. At that meeting, Professor Lowery was informed that no investigation into her claims had begun.

132.    Dr. Norris additionally represented that even if Professor Lowery's claims proved true, there would be no guarantee that MC Law would uphold its contractual obligations under

Professor Lowery's 405(c) contract, or that she would even have any position whatsoever at MC Law in the future.

133.     Finally, when Professor Lowery notified Dean Bennett that she believed she had been constructively terminated due to the law school terminating her classes for the Spring 2021 semester, Dean Bennett did not deny that Professor Lowery had been ousted from the classroom. *See* November 3-9, 2020 Correspondences between P. Bennett and V. Lowery, a true and correct copy attached hereto as **Exhibit G**. Instead, Dean Bennett, acknowledging that Professor Lowery had been removed from the class schedule and replaced with adjunct professors, insisted that Professor Lowery would remain, but only in her capacity as faculty advisor to the Moot Court Board.

134.     Based on the administration's failure and refusal to address her concerns regarding race and gender discrimination and a hostile work environment at MC Law, and on its failure to provide her with class schedule information for the next semester, Professor Lowery was constructively terminated from MC Law in retaliation for reporting these violations of school policy, ABA standards, and federal and state law, and her refusal to cover up the school's violations of the same.

## COUNT I:  BREACH OF CONTRACT/WRONGFUL TERMINATION

135.      Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

136.     Plaintiff Professor Victoria Lowery Leech entered into an employment contract with Mississippi College in 2010.

137.     Pursuant to that contract, Professor Lowery was entitled to a five-year presumptively renewable contract pursuant to ABA standard 405(c).

138.     Under the ABA standards, 405(c) status is a "form of security of position reasonably similar to tenure [and] includes a separate tenure track or a program of renewable long-term contracts."

139.     Additionally, 405(c) status requires "at least a five-year contract that is presumptively renewable or other arrangement sufficient to ensure academic freedom."

140.     Defendant Mississippi College breached this contract by failing and refusing to adhere to the terms of ABA standard 405(c), specifically, 405(c)'s requirements that an employment contract not be terminated except for good cause or material modification or termination of the program.

141.     MC Law's alleged "termination or modification" of Professor Lowery's Advocacy Program was pretextual, did not result in an actual change or termination to the programming, and was not performed in accordance with school policy regarding faculty governance.

142.     Moreover, Professor Lowery was only notified of this alleged termination by Letter of Contract in August 2020.

143.     Professor Lowery was not offered a suitable alternative position and has not been reinstated as Advocacy Director, despite filing a formal grievance with the school requesting to be reinstated or transferred to another program.

144.     As a direct result of the school's breaches and failures to adhere to the terms of Professor Lowery's employment contract, Professor Lowery has been damaged in an amount to be proved at the trial of this matter.

## COUNT II: GENDER DISCRIMINATION

145. Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

146. During his tenure as Associate Dean at MC Law, Jonathan Will has engaged in a pattern of harassing, discriminatory, and retaliatory behavior towards female colleagues, especially Professor Lowery.

147. While Associate Dean Will acted cordially with male professors who participated in discussion regarding the direction of the law school, Professor Lowery was humiliated and received retaliation any time she spoke up against a policy or decision of administration with which she disagreed, including but not limited to, receiving undeserved reprimands from Associate Dean Will as well as being removed by him from committee positions.

148. Associate Dean Will also succeeded in removing Professor Lowery from the legal writing program altogether, hiring, instead, inexperienced, younger, and cheaper professors to teach Professor Lowery's Appellate Advocacy courses.

149. On numerous occasions, Professor Lowery reported this disparate treatment to Dean Bennett. In response, Dean Bennett advised Professor Lowery to simply confront Associate Dean Will and ask him to stop the offensive behavior.

150. Dean Bennett did not advise Professor Lowery as to how to file an internal grievance and did not offer to intervene on Professor Lowery's behalf to address Associate Dean Will's bullying and discriminatory behavior.

151. Moreover, in an attempt to persuade Professor Lowery not to report Associate Dean Will's behavior, or in the alternative, not to leave her position at the law school, Dean Bennett repeatedly assured Professor Lowery that Associate Dean Will would "not be the next dean of the law school."

152.    Finally, upon information and belief, Associate Dean Will's inappropriate behavior towards female faculty has been reported to the school by one or more faculty members, but no action was taken to reprimand Associate Dean Will.

153.    Associate Dean Will's inability to conduct law school business professionally is well-known to the faculty, and specifically, to Dean Bennett, who has done nothing to curb his actions.

154.    This discrimination and retaliation by Associate Dean Will ultimately contributed to the school's termination of Professor Lowery's service as the Advocacy Director.

155.    As a result of this discrimination, Professor Lowery has been damaged by the sex discrimination and hostile work environment created by Associate Dean Will, and allowed by Dean Bennett, in an amount to be proven at the trial of this matter.

## COUNT III:  RACE DISCRIMINATION

156.    Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

157.    Following the ABA's February-March site visit to the school, Dean Bennett and the administration of MC Law began planning and identifying resolutions to the ABA's noted concerns after visiting the school.

158.    According to the ABA, MC Law had not made significant enough efforts to hire diverse faculty members.

159.    In order to make room for diversity hires, Dean Bennett and the administration undertook a scheme to eliminate non-diverse faculty members with earned 405(c) status, in order to provide 405(c) status to diverse faculty, without creating additional long-term obligations for the school.

160.    As a result, Dean Bennett, an African American woman, misrepresented to faculty at the school that the ABA had identified an issue with MC Law's application of 405(c) and that these issues required the termination of the school's non-clinical 405(c) status.

161.    The ABA had never made such a finding.

162.    Despite multiple requests and Dean Bennett's representation at the June 4, 2020 faculty meeting that an impromptu review of all academic programs led by directors with 405(c) was necessary because the ABA had raised concerns about 405(c), and despite the obvious import of the document, Dean Bennett has refused to provide the faculty with the full ABA report

163.    To be clear, nothing Dean Bennett has presented to the faculty indicates a need to terminate existing 405(c) status faculty or programs. Instead, the ABA simply required the promotion of certain staff, currently functioning as faculty, who provide review and instruction to students, in order to bring the school into compliance with Standard 405(c).

164.    Dean Bennett and other members of administration misled faculty members during the June 4, 2020 faculty meeting where Dean Bennett insisted upon a sudden review of all director-led academic programs, under the guise that such a review was necessary given the ABA's concerns about 405(c).

165.    Thus, while the school was obligated to offer Professor Lowery an equivalent position pursuant to her 405(c) status following the alleged termination or modification of her program, Professor Lowery was not offered the available position offered to the diverse faculty member, or any position as clinical faculty at all.

166.    Unlike Professor Lowery, the staff member recommended by Dean Bennett for promotion to 405(c) status is African American.

167. Dean Bennett also has expressed a desire to extend 405(c) protection to a second African American staff member who is currently teaching externship courses.

168. This decision, based on race, and disguised by the pretextual "program modification," resulted in the school refusing to honor its contractual promises to Professor Lowery. Professor Lowery has thereby been damaged in an amount to be proved at the trial of the matter.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Victoria Lowery Leech demands judgment, jointly and severally, of and from Mississippi College as follows:

a.  Preliminary Injunction preventing the Defendant from continuing with Advocacy Program programming without reinstatement or compensation to Professor Lowery, until and through trial on the merits of this cause;

b.  Permanent Injunction preventing the Defendant from continuing with Advocacy Program programming without reinstatement or compensation to Professor Lowery, until and through trial on the merits of this cause;

c.  Damages for breach of contract and wrongful termination, the exact amount to be shown at the trial of this cause;

d.  Compensatory damages;

e.  Damages for discrimination based on gender, the exact amount to be shown at the trial of this cause;

f.  Damages for discrimination based on race, the exact amount to be shown at the trial of this cause;

g.  Punitive damages;

h.      Reasonable attorney's fees incurred herein, the exact amount to be shown at the

trial of this cause;

i.       Pre- and Post-judgment interest;

j.       All costs incurred herein; and,

k.      Such other and further relief as this Court may deem just and proper.

This the 8th day of October 2021.

Respectfully submitted,

*/s/Lindsay K. Roberts*_____

By:     Dorsey R. Carson, Jr. (MSB #10493)
         Lindsay K. Roberts (MSB #105723)
         *Attorneys for Plaintiff*
         *Victoria Lowery Leech*

**OF COUNSEL:**
CARSON LAW GROUP, PLLC
125 S. Congress Street, Suite 1336
Jackson, Mississippi 39201
Telephone: (601) 351-9831
Facsimile:  (601) 510-9056
Email: dcarson@thecarsonlawgroup.com
        lroberts@thecarsonlawgroup.com